IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD

JACQUELINE WALLACE,

    **Plaintiff,**

v.                                           CIVIL ACTION No. 1:09-0511

COMMUNITY RADIOLOGY, et al.,

    **Defendants.**

<u>MEMORANDUM OPINION AND ORDER</u>

Before the court are motions for summary judgment filed by defendants Community Radiology and Dr. Stephen Raskin.  (Docs. No. 99, 101).  For the reasons explained more fully herein, those motions are **GRANTED**.

## I. Factual and Procedural Background.

This civil action arises out of an alleged misreading of a mammogram in March 2007.  The case was originally filed in the Circuit Court of McDowell County, West Virginia, on March 10, 2009.  Plaintiff alleges in her Complaint that defendants incorrectly read her mammogram report and failed to diagnose her with breast cancer.  On May 11, 2009, defendants removed the case to this court, on the basis of diversity jurisdiction.

Except when specifically indicated, the following facts are not in dispute.  In March 2007, Jacqueline Wallace, plaintiff herein, reported feeling a new mass in her right breast to her gynecologist, Dr. Bruce Lasker.  <u>See</u> Exhibit 14 to Defendant Community Radiology's Motion for Summary Judgment (Silver Expert

Report).  Wallace was 56 years old at the time.  <u>See</u> <u>id.</u>  Dr.
Lasker ordered a bilateral mammogram which was taken on March 16,
2007.  <u>See</u> <u>id.</u>  The mammogram was performed at defendant
Community Radiology.  <u>See</u> Exhibit 1 to Community Radiology's
Motion for Summary Judgment.  Defendant Valery P. Sobczynski
interpreted plaintiff's mammogram and, by letter dated March 20,
2007, informed her that the mammogram showed "[n]o evidence of
cancer."  <u>Id.</u>  This letter was written on the letterhead of
Community Radiology and Dr. Stephen P. Raskin  <u>See</u> <u>id.</u>  The
letter also informed Wallace that:  "Some patients with breast
cancer can have normal mammograms.  Should you have a lump or
other change in your breast, contact your physician or other
healthcare provider for an examination without delay."  <u>Id.</u>

At the operative time period and through the date of his
deposition, Dr. Raskin was a board-certified radiologist.  <u>See</u>
Deposition of Stephen Raskin at 13 (Exhibits 2, 9, and 10 to
Community Radiology's Motion for Summary Judgment; Exhibit F to
Raskin's Motion for Summary Judgment).  For a time he also owned
Community Radiology but sold it between 1998 and 2001.  <u>See</u> <u>id.</u>
at 13-14.  Dr. Raskin did, however, stay on at Community
Radiology as an independent contractor.  <u>See</u> <u>id.</u> at 14.  The
relationship between Dr. Raskin and Community Radiology was
memorialized in a "Professional Services Agreement" dated
February 27, 2000.  <u>See</u> Exhibit 6 to Community Radiology's Motion

2

for Summary Judgment.  According to the Agreement, Dr. Raskin was
engaged by Community Radiology "to render full-time medical
services for [Community Radiology] . . . including but not
limited to administrative and professional services provided
through, by and at [Community Radiology].  Id. at p.3.  The
Agreement also states that Dr. Raskin "is and shall at all times
be acting and performing as an independent contractor."  Id. at
p.10.  Pursuant to § 3.1.8 of the Agreement, Dr. Raskin was to
"provide coverage from 8am to 5pm, Monday through Friday, and any
other hours required to meet the business needs of the center.
Radiologist shall also be expected to provide call as needed."
Id. at p.4.  The Agreement further provided Dr. Raskin with ten
weeks of vacation per year but vacation was to "be scheduled only
when it shall not unreasonably disrupt the Center's practice and
only after Radiologist has secured adequate coverage for his
absence.  The Radiologist is responsible for securing adequate
coverage for his absence and compensating the applicable covering
physician."  Id. at pp.7-8.  The relationship between Community
Radiology and Dr. Raskin ended sometime in 2009 or 2010.  See
Raskin Depo. at 15-16.

On June 23, 2006, Dr. Sobczynski entered into a "Provider
Services Agremeent" with a Texas corporation called Staff Care.
Exhibit 3 to Defendant Community Radiology's Motion for Summary
Judgment (hereinafter referred to as "Sobczynski Staff Care

3

Agreement").  Pursuant to the Sobczynski Staff Care Agreement, Staff Care acted as an agent for its clients wishing "to arrange for medical services on a Locum Tenens basis."  Id. at p.1.  A locum tenens physician is one who provides temporary services and generally describes a physician who fills in for another physician on a temporary basis.[1]  Essentially, under the Sobczynski Staff Care Agreement, Staff Care agreed to find work for Dr. Sobczynski as a locum tenens physician.

Dr. Raskin was a client of Staff Care.  See Exhibit 5 to Defendant Community Radiology's Motion for Summary Judgment. Pursuant to Raskin's agreement with Staff Care, Staff Care was to "provide Locum Tenens PROVIDER(s) acceptable to [Dr. Raskin]." Id.  Staff Care was further supposed to "screen and reference" all locum tenens providers, provide malpractice insurance coverage for all locum tenens providers, and provide compensation directly to the locum tenens provider.  Id.

Dr. Sobszynski was filling in for Dr. Raskin on a locum tenens basis when he interpreted plaintiff's mammogram.  See Raskin Depo. at 18.  He was paid by Staff Care for this work.

---

[1]  "Locum Tenens means `one filling an office for a time or temporarily taking the place of another – used especially of a doctor.'" McGhee v. United States, Civil Action No. 7:13-CV-00123, 2014 WL 896748, *1 n.6 (W.D. Va. Mar. 16, 2014) (quoting "Locum Tenens." Merriam-Webster.com, http://www.merriam-webster.com/dictionary/locum%20tenens (last viewed January 26, 2014)).

Raskin Depo. at 55-56; see also Exhibit 4 to Defendant Community Radiology's Motion for Summary Judgment (Sobczynski payroll records).  Staff Care is not a defendant to this lawsuit.

Wallace had her annual mammogram on December 17, 2007.  See Exhibit 14.  That mammogram showed a mass and a subsequent biopsy came back positive for cancer.  See id.  On February 14, 2008, Wallace had a right breast lumpectomy.  See id.  As of April 3, 2008, five of thirteen lymph nodes showed metastatic breast cancer.  See id.  Thereafter, Wallace underwent four cycles of chemotherapy and, after finishing chemotherapy, radiation therapy.  See id.

Plaintiff's radiology expert, Dr. Abbott Huang, stated that he believed Wallace's tumor was visible on the March 2007 mammogram.  See Deposition of Abbott Huang at 57-58 (Exhibits 19-21 and 23 to Community Radiology's Motion for Summary Judgment; Exhibit D to Raskin's Motion for Summary Judgment); Exhibit 14.  According to Dr. Huang, an ultrasound should have occurred that same day given the history of the mass.  See Huang Depo. at 57-58.  Dr. Huang would have recommended a biopsy.  See id. at 58.

Community Radiology's surgical oncology expert, Dr. Charles Goldman, opined that plaintiff would have undergone the same surgical and medical treatment whether a diagnosis of breast cancer was made in March 2007 or December 2007.  See Exhibit 13 to Defendant Community Radiology's Motion for Summary Judgment

(Goldman Expert Report).  Dr. Daniel Silver, Community

Radiology's medical oncology expert, also concluded that

Wallace's treatment for breast cancer was the same as it would

have been had she been diagnosed in March 2007.  See Exhibit 14.

Community Radiology's expert in radiology, Dr. Dennis

Whaley, opined as follows:

> 4.  Based upon my education training, experience, and a
> review of the records in this case it is my opinion
> that Dr. Sobczynski met the applicable standard of care
> in his interpretation of the mammogram films taken of
> Jacqueline Wallace on March 16, 2007, and that no act
> or omission of Dr. Sobczynski proximately caused or
> substantially contributed to the loss of Jacqueline
> Wallace's alleged injuries.
>
> 5.  It is my opinion that the images taken of Jacqueline
> Wallace's right breast on March 16, 2007 did not reveal
> a detectible malignancy, and Dr. Sobczynski
> appropriately read the study as negative.  It is
> further my opinion that it is not a general
> radiologist's obligation or duty [to] order additional
> studies to work up a palpable mass.  Dr. Sobczynski
> appropriately sent a copy of the mammogram report to
> Dr. Lask[e]r, the ordering physician, who was aware of
> the mass and could have ordered additional studies if
> he felt they were necessary.  It is also my opinion
> that Community Radiology appropriately sent a letter to
> Mrs. Wallace stating that some patients with breast
> cancer can have normal mammograms and that an
> examination without delay should be performed by a
> physician if a lump is felt, which Ms. Wallace did not
> do.  Finally, it is my opinion that Dr. Raskin did not
> have any obligation or duty to review Dr. Sobczynski's
> interpretations of mammograms.  Dr. Sobczynski was a
> board certified radiologist, who was qualified to
> review mammograms.  Likewise, no agents or employees of
> Community Radiology had any obligation to review Dr.
> Sobczynski's interpretation of mammograms.

Exhibit 15 to Community Radiology's Motion for Summary Judgment

(Whaley Expert Report).

6

Elizabeth Davis, R.N., was identified as an expert witness on plaintiff's behalf.  See Exhibit 11 to Community Radiology's Motion for Summary Judgment.  Regarding the expert opinions she proposed to tender, Ms. Davis testified at her deposition:

Q:  And you're not, as I understand it, going to testify at trial that her treatment would have been any different, if her tumor had been diagnosed earlier.  Correct?

A:  Correct.

Q:  Okay.  And you're not going to testify that she would have needed - would not have needed Adriamycin or would not have needed Herceptin if she had been diagnosed earlier.  Correct?

A:  Correct.

* * *

Q:  I just want to make sure that I understand – that I'm clear on this: You're not going to come to trial and testify about the duty or obligation of Community Radiology, or anyone associated with Community Radiology, as far as their role in the mammogram or the imaging.  Is that correct?

A:  That is - that is correct.

Q:  And you're not going to testify regarding whether or not Dr. Sobczynski read the mammogram correctly or incorrectly.  Is that a fair statement?

A:  Yes, ma'am, it is.

Q:  You're not going to offer any opinions about Dr. Sobczynski's ability to interpret mammograms correctly. Would that be a fair statement?

A:  Yes, ma'am.

Q:  You're not going to offer any opinion regarding whether or not there was a delay in diagnosis of Ms. Wallace's breast cancer, are you?

7

A:   No, I am not.

Q:   Are you going to offer any opinion regarding when the cancer started?

A:   No, ma'am.

Q:   I think I've already asked this, but you're not going to offer any opinion as to whether or not treatment would have differed in any way if it had been diagnosed earlier?

A:   No.

Q:   You're not going to offer any kind of medical causation opinions.  Correct?

A:   Correct.

Q:   Are you going to offer any opinions regarding life expectancy or reoccurrence rates, other than what's in the e-mail from Ms. Wallace?

A:   No, I'm not independently qualified to do that, other than to consult the CDC for normal life expectancy rates.

                              * * *

Q:   And, just so I'm clear, when you refer to the expenses, you're not going to come to trial and testify as to whether any of those expenses were incurred as a result of any negligence.  Correct?

A:   Correct.  I'm using that as a cost source.

                              * * *

Q:   And, again, it's not your opinion  - you're not going to testify that Adriamycin would not have been needed if she had had an earlier diagnosis.  Correct?

A:   Correct.

Q:   And that would be the same with the Taxol or the Arimidex or the Herceptin?  You are not going to testify that those would not have been needed if there had been an earlier diagnosis.  Correct?

8

A:   Correct.

* * *

Q:   And, again, the items that you had set forth in that
     Life Care Plan, although you have them listed, you're
     not saying that they're causally related to any
     deviation from the standard of care by Dr. Sobczynski,
     or anyone else.   Correct?

A:   Correct.  I was listing her regimen as it was
     unfolding, basically as she was receiving that level of
     care with the specific medications and the follow-up
     schedules.

Q:   And you would defer to a physician to determine - to
     testify whether any of that was causally related to the
     alleged negligence.   Correct?

A:   Correct.

* * *

Q:   Ms. Davis, I just have a few more questions, I think.
     You're not going to offer any opinions regarding
     whether the axillary node dissection was necessary
     because of the delay.   Correct?

A:   Correct.

Deposition of Elizabeth Davis at 26-30, 34, and 39 (Exhibits 17

and 18 to Community Radiology's Motion for Summary Judgment).

   Plaintiff's expert, Dr. Huang, believes that Dr. Sobczynski

was negligent in misreading plaintiff's March 2007 mammogram as

negative and that the standard of care required him to order an

ultrasound.   See Huang Depo. at 77.   However, with respect to

the specific liability of Community Radiology and Dr. Raskin, Dr.

Huang found none:

Q:   Are you critical of any other medical providers besides
     Dr. Sobczynski who read the mammogram on March 16,
     2007?

9

A:   What do you mean by "critical"?

Q:   Do you have any opinions that any other medical
     providers deviated from the standard of care besides
     Dr. Sobczynski who read the mammogram on March 16.
     2007?

                         * * *

A:   Okay.  Let me look.  I have a report dated March 16,
     2007 and it is Dr. Valery Sobczynski.  I guess that's -
     yes.

Q:   So is he the only medical provider that you have
     criticisms of or believe deviated from the standard of
     care in this case?

A:   Yes, I think he is the only one.

                         * * *

Q:   On those occasions where you had a Locum Tenens
     physician come in, do you, as, you know, a radiologist
     within this practice go back and reread every single
     study that they read while they were here?

A:   No, we don't do that.

Q:   The standard of care doesn't require that, does it?

A:   I don't know if there is a standard of care for it.  I
     don't know the answer to that.

                         * * *

Q:   So to be clear, you are not going to come to trial and
     offer any opinions related to Dr. Raskin?

A:   Interpretation, no.

Q:   Likewise, you are not going to come to trial and
     testify that Dr. Raskin did something wrong or
     Community Radiology did something wrong in bringing Dr.
     Sobczynski on as a Locum Tenens physician, correct?

A:   I didn't know he - I wasn't a hundred percent sure he
     was a Locum Tenens so as far as them bringing him on, I

                            10

don't have any problem with them bringing him on.   I
assumed they needed Locums work.

\* \* \*

Q:   Do you have any criticisms of the technique that was
     used or the quality of the mammograms?

A:   All of them are just - you want me to go through all of
     them?

Q:   No. The one that is at issue.

A:   They are fine.   The quality is fine.

\* \* \*

Q:   So you wouldn't have expected someone to go behind Dr.
     Sobczynski and read or reinterpret his work once he had
     dictated his reports or read the films, correct?

A:   Unless somebody asked someone else to read it, no.
     Sometimes you get asked to read something somebody else
     read, but it would have been someone to come to that
     person to read it.   It wouldn't have been him doing it
     just off the cuff.

Q:   You wouldn't expect someone from Community Radiology to
     look at Dr. - on March 17, or 16, whenever Dr.
     Sobczynski looked at that film and he gave his
     interpretation, then you wouldn't expect someone else
     to go behind him to look at that to see if he was right
     or wrong?

A:   Unless someone asked you to do it I would not expect
     it.

Q:   Okay.   You don't do that with your colleagues, do you?
     You don't go behind them and say, I'm just going to
     check and make sure he is right today?

\* \* \*

A:   No.   Outside of QA, we don't normally do it.   We do it
     just on a QA basis.

\* \* \*

11

Q:    It is not the duty of a radiology technologist to
      interpret mammograms, correct?

A:    That is correct, yes.

Huang Depo. at 56-57, 73-80, 86-89.

Dr. Huang further testified regarding the extent of the

expert opinion he intended to offer.

Q:    Do you believe you are qualified to render opinions
      regarding the oncology treatment for Mrs. Wallace's
      cancer for her prognosis?

A:    No.

Q:    So I take it then that you will defer to a medical
      oncologist or surgical oncologist to offer opinions
      regarding causation in this case, correct?

A:    Correct.

                      * * *

Q:    So my question is are you going to come to trial and
      say that if the mammogram had been read differently in
      March of 2007 it would have changed her outcome or her
      treatment in any way or are you going to rely on an
      oncology [expert]?

A:    I will rely on an oncologist.

                      * * *

Q:    And it's not your intention to come to trial and offer
      any opinions related to how delayed - alleged delay and
      misreading the mammogram caused her any damages and
      that is probably a bad question, but you will not come
      to trial and say her cancer was more advanced; is that
      correct?  You will defer?

A:    More advanced to what?

Q:    You will defer to a medical oncologist or surgical
      oncologist to give those opinions?

A:   When you say "more advanced," more advanced toward
     what?  I don't understand what you are saying to me.

Q:   Was it a different stage, would the treatment be any
     different?

A:   I don't know anything about treatment so I will not
     comment about treatment.

Q:   Again, you will defer to a surgical oncologist or
     medical oncologist with respect to that, correct?

A:   I would defer to someone that has expertise in that.  I
     don't have expertise in that.

Q:   Who would that be, an oncologist?

A:   Likely be an oncologist, yes.

                         * * *

Q:   You don't intend to offer an opinion about the
     biological makeup of the tumor if it would have been
     different at one point as opposed to another?

A:   No, I will not.

Q:   It's my understanding that you do not intend to offer
     any opinion as to the effect of any alleged delay on
     the treatment that she received; is that correct?

A:   Say that one more time.  Alleged defect?

Q:   No.  You are alleging that - or your opinion is that
     the March 2007 mammogram was misread?

A:   Correct.

Q:   And, therefore, it was no - the cancer was not
     diagnosed until the December mammogram, correct?

A:   Yes.

Q:   Are you going to offer any opinion that the nine month
     period of time changed the nature or the type of
     treatment that Mrs. Wallace would have received?

                           13

A:   No.  Like I said, I don't know about treatment so I
     would not.  I won't opine on that.

Q:   Do you intend to offer any opinions regarding her
     prognosis or recurrence rate?

A:   No.

Q:   Do you intend to offer any opinions as to her damages,
     how much she incurred as a result of or how much her
     medical bills were a result of a delay in diagnosing
     cancer?

A:   No.

Q:   Do you intend to offer any opinions on her future care
     needs?

A:   No.

Q:   I believe you might have been asked this, but you are
     not offering life expectancy opinions, correct?

A:   That's correct.

Huang Depo. at 27-29, 77-78, 91-92.

Both Community Radiology and Dr. Raskin have moved for

summary judgment.  Plaintiff filed a response in opposition

arguing that summary judgment is inappropriate because there are

disputed issues of material fact.  Those motions are ripe for

review.


## II. Summary Judgment Standard.

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered
> forthwith if the pleadings, depositions,
> answers to interrogatories, and
> admissions on file, together with the
> affidavits, if any, show that there is

14

> no genuine issue as to any material fact
> and that the moving party is entitled to
> a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial.  Id. at 322.  If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of
> evidence in support of the plaintiff's
> position will be insufficient; there
> must be evidence on which the jury could
> reasonably find for the plaintiff.  The
> judge's inquiry, therefore, unavoidably
> asks whether reasonable jurors could
> find, by a preponderance of the
> evidence, that the plaintiff is entitled
> to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 250-51.

15

## III. Analysis.

"In West Virginia, the Medical Professional Liability Act ("MPLA") controls medical malpractice claims." Dreenen v. United States, 2010 WL 1650032, *2 (4th Cir. 2010); Callahan v. Cho, 437 F. Supp. 2d 557, 561 (E.D. Va. 2006); Stanley v. United States, 321 F. Supp. 2d 805, 808-09 (N.D.W. Va. 2004); Osborne v. United States, 166 F. Supp. 2d 479, 496-97 (S.D.W. Va. 2001); Bellomy v. United States, 888 F. Supp. 760, 764-65 (S.D.W. Va. 1995).

The MPLA provides that in order to bring such a claim, a plaintiff must prove that:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (2) Such failure was a proximate cause of the injury or death.

W. Va.Code § 55-7B-3(a). When a medical negligence claim involves an assessment of whether the plaintiff was properly diagnosed and treated, or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hosp. for Rehabilitation, 539 S.E.2d 600, 605-06 (W. Va. 2000).[2]

---

[2]  "West Virginia law stipulates that medical experts must establish the applicable standard of care in medical malpractice cases. W. Va. Code § 55-7B-7(a). The only exceptions to this requirement, where the breach of duty is so gross as to be apparent or the standard is within the common knowledge of lay jurors, are

16

According to Community Radiology and Dr. Raskin, plaintiff cannot prevail on her MPLA claim because she cannot establish the essential elements of her case.  Specifically, they contend that they are entitled to judgment in their favor because:

> 1.   Plaintiff has failed to establish that Community Radiology breached any duty to plaintiff.
>
> 2.   Plaintiff has failed to establish that Dr. Raskin breached any duty to plaintiff.
>
> 3.   Dr. Sobczynski was not an agent of Community Radiology or Dr. Raskin.
>
> 4.   There is no evidence that the alleged negligence in this case was the proximate cause of plaintiff's injuries.
>
> 5.   Plaintiff has failed to join an indispensable party.

Dr. Huang's opinion is sufficient to raise a disputed issue of material fact as to whether Dr. Sobczynski "failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider." However, even assuming that Community Radiology and Dr. Raskin could be somehow vicariously liable for Dr. Sobczynski's negligence,[3] there is no evidence that any alleged failure on the

_____

the same as the exceptions to the medical certificate requirement." Callahan v. Cho, 437 F. Supp. 2d 557, 564 (E.D. Va. 2006).

[3]  The court notes that plaintiff has proffered no expert testimony which even suggests that Community Radiology or Dr. Raskin committed any independent acts of negligence.  Indeed, Dr. Huang testified that he believed that Dr. Sobczynski was the only medical provider who deviated from the standard of care.  See Huang

part of Dr. Sobczynski was a proximate cause of plaintiff's injuries.  As noted above, such causation ordinarily must be established by expert testimony.  Hicks v. Chevy, 358 S.E.2d 202, 205 (W. Va. 1987) ("Proof that the negligence or want of professional skill was the proximate cause of the injury of which the plaintiff complains must ordinarily be by expert testimony as well."); see also Farley v. Shook, 629 S.E.2d 739, 745 (W. Va. 2006) (finding summary judgment proper in medical malpractice case where plaintiffs' expert "was unable to link any of the[] alleged breaches in care to the ultimate outcome"); Short v. Appalachian OH-9, Inc., 507 S.E.2d 124, 131-32 (W. Va. 1998) (finding failure to produce expert testimony on causation in opposition to summary judgment fatal).

_____

Depo. at 57.  Therefore, the negligence of Community Radiology and Dr. Raskin, if any, turns on their relationship with Dr. Sobczynski.  Significant portions of defendants' briefs, as well as the majority of plaintiff's response in opposition, focus on whether Dr. Sobczynski was an agent, actual or apparent, of Community Radiology and/or Dr. Raskin.  Any argument that Dr. Sobczynski was an apparent agent is foreclosed by West Virginia Code § 55-7B-9(g).  That statute provides that "(a) health care provider may not be held vicariously liable for the acts of a non-employee pursuant to a theory of 'ostensible agency' unless the alleged agent does not maintain professional liability insurance covering the medical injury which is the subject of the action in the aggregate amount of at least one million dollars."  The evidence shows that Dr. Sobczynski was insured, via his arrangement with Staff Care, in the amount of $1 million per occurrence. Accordingly, as to the plaintiff's claims of ostensible agency, the defendants' motions for summary judgment are **GRANTED**.

However, because the actual agency argument is not disposed of quite as easily the court declines to reach the issue.

18

Plaintiff has offered <u>no</u> evidence or testimony, expert or otherwise, establishing that any negligence by Dr. Sobczynski was the proximate cause of her injuries.  For example, there is no evidence in the record to show that plaintiff's treatment options would have been different had she been diagnosed in March 2007.  See <u>Totten v. Adongay</u>, 337 S.E.2d 2, 8 (W. Va. 1985) (distinguishing cases where causation is "reasonably direct or obvious" as obviating need for expert medical testimony).  Without any evidence showing how a delay in diagnosis and treatment caused or contributed to her injuries, plaintiff cannot meet her burden to show that Dr. Sobczynski's alleged negligence was a proximate cause of her injuries.  Furthermore, without this type of evidence a jury would have to make a guess as to how plaintiff's injuries were exacerbated by Dr. Sobczynski's alleged negligence.  This is exactly why expert testimony regarding proximate causation is necessary.

Just recently, the West Virginia Supreme Court of Appeals decided a case in which a lack of expert medical testimony as to causation was fatal to a medical negligence claim.  See <u>Dellinger v. Pediatrix Medical Group, P.C.</u>, 750 S.E.2d 668, 677-78 (W. Va. 2013).  In affirming the lower court's grant of summary judgment for a defendant doctor, the court noted:

> Petitioner argues that proximate causation was an issue for the jury, despite Dr. Weber [plaintiff's medical expert] conceding that he could not state to a reasonable degree of

probability that Amber would have survived if
intubated earlier and his commensurate inability
to "quantify" any worsening in her condition
caused by a purported delay in intubation.

* * *

[P]etitioner herein has provided not a single
medical witness who offered testimony casually
connecting Amber's death to Dr. Caceres' alleged
negligent failure to intubate earlier.  In fact,
the only witness whose testimony petitioner
offered in opposition to summary judgment
expressly stated he <u>could not</u> proximately relate
Amber's death to any actions of Dr. Caceres to a
reasonable degree of medical probability:

    Q:  You cannot say more likely than not that
        this patient would have lived if the
        blood gas value would have been given to
        Dr. Caceres earlier?

    A:  That's correct.

    While petitioner urges that the jury may
nonetheless infer proximate cause notwithstanding
her lack of medical testimony on this issue, we
find there is quite simply nothing upon which a
jury may make such an inference beyond abject
speculation.

<u>Id.</u> at 676-77 (emphasis in original).  As in <u>Dellinger</u>, plaintiff

has failed to meet her burden to establish proximate cause.  Both

of her experts confirmed that they were not able to render an

opinion on proximate causation and this is not the type of case

where proximate causation is "reasonably direct or obvious."

    Faced with her failure of proof on this issue, plaintiff

points the court to a case from Texas which, according to her,

suggests that the court should allow the issue to go to the jury.

See <u>Consultants in Radiology v. S.K. and C.K.</u>, No. 02-14-00091-

CV, 2014 WL 2922301 (Ct. App. Tex. 2014).  In that case, the court was reviewing the sufficiency of an expert report under Texas law, specifically Tex. Civ. Prac. & Rem. Code Ann. § 74.351.  That code section requires a plaintiff in a health care liability claim to present an expert report that, among other things, "establish[es] the causal relationship between the failure and the harm alleged."  Tex. Civ. Prac. & Rem. Code Ann. § 74.351.  Id.  As in this case, the plaintiffs had been diagnosed with breast cancer but contended that defendants should have diagnosed the breast cancer at an earlier stage.  See Consultants in Radiology v. S.K. and C.K., No. 02-14-00091-CV, 2014 WL 2922301, *1 (Ct. App. Tex. 2014).  In affirming the lower court's ruling which found the expert reports sufficient as to causation, the Texas appellate court concluded that the expert reports in question "made a good faith effort at informing the trial court and Appellants of the causal relationship between the [defendants]' failures and the harm alleged by [plaintiffs]." Id. at 5.  However, the expert report in that case – which involved a longer period of delay in diagnosing cancer than is alleged here – clearly laid out the ramifications of the delay in diagnosis in treatment.  For example, the expert report in the Texas case noted, among other things that:

> 1.    Had the defendant doctor "properly recommended a
>       biopsy" following the earlier mammogram, "more
>       likely than not" it would have resulted in plaintiff

being diagnosed with DCIS, instead of Stage IIIC invasive ductal carcinoma.

2. DCIS is the most treatable form of breast cancer and carries the best prognosis.

3. "Had [plaintiff] been properly diagnosed shortly after the mammogram, or shortly after the recommended follow-up period, her treatment would have most likely been lumpectomy with radiation or mastectomy surgery.  Chemotherapy is not required for DCIS, and [plaintiff]'s prognosis would have been excellent. . . .  Quite simply, with timely follow-up exams and biopsy, [plaintiff] would likely not have required chemotherapy and/or died from breast cancer."

Id. at 4.

Plaintiff's reliance on the Consultants in Radiology case misses the mark because in this case there is no expert report that lays out any consequences of a delay in her diagnosis and treatment.  Furthermore, to the extent that plaintiff seems to suggest that the Texas case allows the court to infer a period of delay in diagnosing breast cancer is always a proximate cause of a plaintiff's injuries, the court declines to do so because such an inference would be "abject speculation."

For these reasons, plaintiff's failure to offer evidence sufficient to establish a prima facie case of liability under W. Va. Code § 55-7B-3 mandates entry of summary judgment in defendants' favor.

## IV. Conclusion.

Based on the foregoing, defendants' motions for summary judgment are **GRANTED**.  Because the court has determined that

defendants are entitled to judgment in their favor on the grounds
discussed herein, it has not reached the other arguments raised
by Community Radiology and Dr. Raskin in support of their motions
for summary judgment.

The Clerk is directed to mail copies of this Memorandum
Opinion and Order to all counsel of record.

It is SO **ORDERED** this 18th day of April, 2016.

ENTER:

David A. Faber
Senior United States District Judge

23